**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 21-2630
_____

EUGENE MAZO;
LISA MCCORMICK,

Appellants

v.

NEW JERSEY SECRETARY OF STATE;
E. JUNIOR MALDANADO, in his official capacity as
Hudson County Clerk;
JOANNE RAJOPPI, in her official capacity as Union County
Clerk;
PAULA SOLLAMI COVELLO, in her official capacity as
Mercer County Clerk;
ELAINE FLYNN, in her official capacity as Middlesex
County Clerk;
CHRISTOPHER DURKIN, in his official capacity as Essex
County Clerk;
STEVE PETER, in his official capacity as Somerset County
Clerk

_____

On Appeal from the United States District Court
for the District of New Jersey
District Court No. 3-20-cv-08174
District Judge:  The Honorable Freda L. Wolfson
_____

Argued July 6, 2022

Before: SHWARTZ, KRAUSE, and ROTH, *Circuit Judges*

(Filed: November 23, 2022)

Ryan Morrison [ARGUED]
Institute for Free Speech
1150 Connecticut Avenue, N.W.
Suite 801
Washington, DC 20036

Walter M. Luers
Cohn Lifland Pearlman Herrmann & Knopf
Park 80 West - Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663
            *Counsel for Appellants*

Angela Cai [ARGUED]
Nicole E. Adams
Dominic L. Giova
Office of Attorney General of New Jersey
Division of Law
25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ 08625
            *Counsel for Appellee New Jersey Secretary of State*

Walter S. Zimolong, III
Zimolong
353 West Lancaster Avenue
Suite 300
Wayne, PA 19087
*Counsel for Amicus Appellants*
*Professor Derek T. Muller and Professor Michael R. Dimino*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*

Nowhere are the First Amendment rights of free speech and association more essential, or more fiercely guarded, than in the context of free and open elections. Self-government depends on ensuring that speech intended to support, challenge, criticize, or celebrate political candidates remains unrestricted. But at the end of every hard-fought political campaign lies the ballot box, where our constitutional democracy depends equally on States fulfilling their solemn duty to regulate elections to ensure fairness and honesty, even where doing so may burden some First Amendment rights. For this reason, courts have long applied the more flexible *Anderson-Burdick* balancing test to evaluate constitutional challenges to state election laws that govern the mechanics of the electoral process. At the same time, however, courts continue to apply a traditional—and often quite stringent—First Amendment analysis to state election laws that implicate core political speech outside of the voting process.

This case asks us to determine where the campaign ends and the electoral process begins. New Jersey permits candidates running in primary elections to include beside their name a slogan of up to six words to help distinguish them from others on the ballot. N.J. Stat. § 19:23-17. But New Jersey also requires that candidates obtain consent from individuals or New Jersey incorporated associations before naming them in their slogans. Appellants Eugene Mazo and Lisa McCormick challenged this requirement after their desired slogans were rejected for failure to obtain consent. They argue that New Jersey's ballot slogans are, in effect, part of the campaign—a final, crucial opportunity for candidates to communicate directly with voters—and that the consent requirement should therefore be subject to traditional First Amendment scrutiny. The District Court disagreed. It held that, though the ballot slogans had an expressive function, the consent requirement regulates the mechanics of the electoral process, and so applied the *Anderson-Burdick* test, ultimately finding the consent requirement constitutional.

We agree with the District Court. In so doing, we recognize the line separating core political speech from the mechanics of the electoral process has proven difficult to ascertain: "Not only has the Supreme Court itself fractured deeply in the application of this jurisprudence, but so too has the judiciary in general." PRINCIPLES OF THE L. OF ELECTION ADMIN.: NON-PRECINCT VOTING AND RESOL. OF BALLOT-COUNTING DISP. § 201 (AM. L. INST., Tentative Draft No. 2, 2017). Thus to "develop[] . . . this constitutional jurisprudence in ways that most promote rule-of-law values and the legitimacy of the electoral process, including the critical value of clarity," we take this opportunity to survey the range of election laws to which the Supreme Court and appellate courts

have applied the *Anderson-Burdick* test, as opposed to a traditional First Amendment analysis. *Id*. From that review, we derive criteria to help distinguish—along the spectrum of mechanics of the electoral process to pure political speech—which test is applicable. And applying those criteria here, we conclude that New Jersey's consent requirement is subject to *Anderson-Burdick*'s balancing test. We also conclude that because New Jersey's interests in ensuring election integrity and preventing voter confusion outweigh the minimal burden imposed on candidates' speech, the consent requirement passes that test. We will therefore affirm the judgment of the District Court.

## I.     Background

### A.     New Jersey's Ballot Slogan Statutes

In New Jersey, a candidate who wants to have her name placed on the ballot for a primary election must file a petition containing certain information about the candidate and the requisite signatures for the public office sought. *See* N.J. Stat. Ann. §§ 19:23-5 to -11.[1] For candidates seeking federal office, these petitions must be directed to the Secretary of State, *id.* § 19:23-6, who is responsible for certifying petitions, *id.* §§ 19:13-3, 19:23-21, and instructing local election officials about the names and information that are to be placed on the primary ballots, *id.* §§ 19:23-21 to -22.4.[2]

---

[1] New Jersey has adopted a similar system for unaffiliated candidates seeking to be placed on the general election ballot. *See* N.J. Stat. §§ 19:13-1 to -3.

[2] The Secretary of State is also responsible for petitions for statewide offices; candidates seeking county or local office,

Since 1930, New Jersey law has permitted candidates running in a primary election for "any public office" to "request that there be printed opposite his name on the primary ticket a designation, in not more than six words, . . . for the purpose of indicating either any official act or policy to which he is pledged or committed, or to distinguish him as belonging to a particular faction or wing of his political party." N.J. Stat. § 19:23-17.

In 1944, the New Jersey legislature amended the law to include the proviso that "no such designation or slogan shall include or refer to the name of any person or any incorporated association of this State unless the written consent of such person or incorporated association of this State has been filed with the petition of nomination of such candidate or group of candidates." *Id.* This consent requirement is reiterated in N.J. Stat. § 19:23-25.1, which states that no ballot slogan "shall be printed" that "refers to the name of any other person unless the written consent of such other person has been filed with the petition of nomination of such candidate or group of candidates."[3] These "Slogan Statutes" and their consent requirement are enforced by the Secretary of State in all federal

_____

however, must direct their petitions to the appropriate county or municipal clerks. *See* N.J. Stat. § 19:23-6.

[3] New Jersey allows for unaffiliated candidates running in a general election to include a similar three-word slogan conveying "the party or principles" the candidate represents, so long as that slogan does not include any part of the name of another political party. N.J. Stat. § 19:13-4.

and state-wide primary races as part of the certification process.  *See* N.J. Stat. § 19:23-21.[4]

### B.    Appellants' Slogans

Appellants Eugene Mazo and Lisa McCormick were candidates in the July 7, 2020, Democratic Primary for the House of Representatives in New Jersey's Tenth and Twelfth Congressional Districts, respectively.  Mazo requested ballot slogans for each of the ballots printed by the three counties that comprise New Jersey's Tenth District:

- In Essex County: "Essex County Democratic Committee, Inc."
- In Hudson County: "Hudson County Democratic Organization."
- In Union County: "Regular Democratic Organization of Union County."

Am. Compl. ¶ 37 (App. 48).  Because each of these slogans "referred to the names of New Jersey incorporated associations," state officials informed Mazo that authorization from the chairperson of the organizations was required and that if he did not obtain authorization, "his nomination petition would be certified as 'NO SLOGAN.'"  Am. Compl. ¶ 38 (App. 48-49).  Mazo never obtained the required consent, and instead "used three different slogans with the authorization of three other New Jersey incorporated associations that he created."  Am. Compl. ¶ 39 (App. 49).

---

[4] For local primary elections, county and municipal clerks are responsible for enforcing the consent requirements.  *See* N.J. Stat. §§ 19:23-22; 19:23-22.1.

McCormick originally requested the ballot slogan "Not Me. Us.," Am. Compl. ¶ 41 (App. 49), but was told that, because this slogan referred to another New Jersey incorporated association, she also required the organization's authorization.  McCormick did not obtain the necessary consent and instead requested, as an alternative slogan, "Bernie Sanders Betrayed the NJ Revolution." Am. Compl. ¶¶ 43-44 (App. 49).  But because this new slogan still named an individual, again she was told consent was required.  McCormick did not obtain consent and ultimately settled on a different slogan, "Democrats United for Progress," for which she did obtain authorization.  Am. Compl. ¶ 45 (App. 49).

## C.    Procedural Background

On July 2, 2020, five days before the primary election, Mazo and McCormick filed suit in the District of New Jersey, naming the New Jersey Secretary of State and various county clerks as defendants, collectively "the Government."  Their complaint sought declaratory and injunctive relief, claiming that the consent requirement was unconstitutional, both facially and as-applied, under the First and Fourteenth Amendments.[5]  In response, both the Secretary of State and the Clerks moved to dismiss.

The Secretary of State argued that Appellants' claims were both moot (because the primary election had passed) and unripe (because the next primary was more than a year away), and also that the consent requirement was constitutional.  For

---

[5] Appellants initially also sought nominal damages but abandoned that claim as against the Secretary of State and no longer press the issue on appeal.

their part, the Clerks primarily urged that they were improper defendants because, under New Jersey law, they did not enforce the Slogan Statutes for congressional elections and lacked discretion to contradict the Secretary of State's instructions.

The District Court considered each of these arguments and concluded that (1) Appellants' claims were both ripe and not moot, *Mazo v. Way*, 551 F. Supp. 3d 478, 491-98 (D.N.J. 2021), (2) the Clerks did not exercise any discretion with respect to enforcing the Slogan Statutes, *id.* at 509, and (3) the consent requirement was constitutional, both facially and as-applied, *id.* at 498-508. The Court thus dismissed the case, and Appellants timely appealed.

## II.    **Standard of Review**

We review a district court's denial of a Rule 12(b)(6) motion *de novo*. *Keystone Redev. Partners, LLC v. Decker*, 631 F.3d 89, 95 (3d Cir. 2011). We also accept all of Appellants' well-pleaded factual allegations as true and draw "all reasonable inferences" in their favor. *Simko v. U.S. Steel Corp.*, 992 F.3d 198, 203-04 (3d Cir. 2021) (citing *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016)).

To prevail on a facial challenge[6], a plaintiff must "establish that no set of circumstances exists under which the

---

[6] Appellants purport to raise both a facial and an as-applied challenge to the Slogan Statutes. But as the District Court observed, Appellants have not "plead[ed] any facts showing that [the Secretary of State] enforced the [consent requirement] against them in an unconstitutional or otherwise irregular manner." *Mazo*, 551 F. Supp. 3d at 498 n.7 (D.N.J. 2021) (citation omitted). Instead, their complaint merely repeats the

[law] would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), or, in the First Amendment context, show that the law is overbroad because "a substantial number" of its applications are unconstitutional, "judged in relation to [its] plainly legitimate sweep," *New York v. Ferber*, 458 U.S. 747, 770-71 (1982).[7]

## III.    Jurisdiction and Justiciability

The District Court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction over its final order of dismissal under 28 U.S.C. § 1291.  As we have an obligation to determine whether a controversy is justiciable before resolving its merits, we examine whether the challenge is both ripe and not moot.  *See Larsen v. Senate of Pa.*, 152 F.3d 240, 246 (3d Cir. 1998).

---

legal conclusion that the consent requirement "restricted [Appellants'] freedom of expression," Am. Compl. ¶ 59 (App. 51) and does not specify how their freedom of speech or association was burdened by enforcement of the consent requirement.  We therefore construe their Complaint as raising only a facial challenge.  *Cf. United States v. Marcavage*, 609 F.3d 264, 274 (3d Cir. 2010) (construing an unclear complaint as bringing an as-applied claim where the plaintiff's argument was "entirely dependent on the facts of th[e] case").

[7] The standard for bringing an as-applied challenge is less demanding; a plaintiff need only show that a law's "application to a particular person under particular circumstances deprived that person of a constitutional right."  *Marcavage*, 609 F.3d at 273.

To determine if a claim is ripe, we consider "whether the parties are in a 'sufficiently adversarial posture,' whether the facts of the case are 'sufficiently developed,' and whether a party is 'genuinely aggrieved.'" *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 539 (3d Cir. 2017) (quoting *Peachlum v. City of York*, 333 F.3d 429, 433-34 (3d Cir. 2003)). In the declaratory judgment context, we apply these principles by considering three enumerated factors: "(1) the adversity of the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the judgment." *Khodara Env't, Inc. v. Blakey*, 376 F.3d 187, 196 (3d Cir. 2004) (quoting *Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1298 (3d Cir. 1996)); *see also Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 646-50 (3d Cir. 1990).

Here, Appellants satisfy all three ripeness factors. First, the parties' interests are sufficiently adverse, as Appellants aver that they will suffer a "substantial threat of real harm" in the form of a First Amendment injury "if the declaratory judgment is not entered." *Plains*, 866 F.3d at 541 (quoting *Presbytery of N.J. of Orthodox Presbyterian Church*, 40 F.3d 1454, 1463 (3d Cir. 1994) and *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1154 (3d Cir. 1995)). Second, because the issues in this case are purely legal, and because Appellants plan to request similar ballot slogans without obtaining consent in the future, a declaratory judgment would conclusively resolve Appellants' facial challenge. *See Florio*, 40 F.3d at 1468 ("[P]redominantly legal questions are generally amenable to a conclusive determination in a preenforcement context."). Third, a declaratory judgment would be particularly useful for Appellants here, as New Jersey typically does not provide nominating petitions until the December or January before the spring primary campaign, meaning Appellants would

otherwise be left with uncertainty as they plan their future campaigns. *See, e.g.*, *Arsenault v. Way*, 539 F. Supp. 3d 335, 340-41 (D.N.J. 2021) (describing abbreviated timeline). In short, Appellants' claim is ripe for decision.

Appellants' claim is also not moot. A claim is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). There is an important exception, however, for claims that are "capable of repetition, yet evading review," *i.e.*, where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 170 (2016) (alterations omitted) (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). Courts frequently apply this exception to election cases given the recurring nature of elections and the often strict time frames associated with running for office. *See, e.g.*, *Norman v. Reed*, 502 U.S. 279, 288 (1992) ("There would be every reason to expect the same parties to generate a similar, future controversy subject to identical time constraints[.]").

That exception applies with full force in this case. New Jersey need not certify a proposed ballot slogan until fifty-four days prior to the primary election, and county clerks may begin printing ballots any time after fifty days prior to the election. That leaves only a narrow window in which candidates might challenge a rejected slogan, N.J. Stat. Ann. §§ 19:23-21; 19:23-22.4, and Appellants have affirmed their intent to run for office again without obtaining the necessary consent.

Appellants' challenges to the consent requirement thus present a live controversy over which we may exercise jurisdiction.

## IV.    Discussion

The central issue in this case is the parties' disagreement over which constitutional test applies to New Jersey's consent requirement.    The Government maintains that the District Court correctly applied the sliding-scale approach for election regulations developed in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). Appellants argue that the District Court should have employed a traditional First Amendment analysis applying strict scrutiny because the consent requirement is a content-based restriction of their speech.    Thus, to determine the constitutionality of the consent requirement, we must first determine which test applies.

Below we consider: (a) the need for clarification given the case law to date; (b) circumstances in which the *Anderson-Burdick* test applies; (c) the test applicable to New Jersey's consent requirement; and (d) applying this test, whether the consent requirement is constitutional.

### A.    The Case Law to Date

Elections occupy a special place in our constitutional system, as do election laws.  The Constitution expressly grants States the authority to set rules for the time, place, and manner of federal elections.  U.S. Const. Art. I, § 4, cl. 1; Art. II, § 1, cl. 2.  Pursuant to these clauses, States have long maintained "comprehensive, and in many respects complex, election codes regulating . . . the time, place, and manner of holding primary and general elections."  *Storer v. Brown*, 415 U.S. 724, 730

(1974). States' authority over federal elections is broad, encompassing "notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). It is even broader with respect to state and local elections. *See Sugarman v. Dougall*, 413 U.S. 634, 647 (1973). That is because, if elections "are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process," *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick*, 504 U.S. at 433), it is "[c]ommon sense" that States must take an "active role in structuring elections," *Burdick*, 504 U.S. at 433.

Yet because States "comprehensively regulate the electoral process," *Council of Alt. Pol. Parties v. Hooks*, 179 F.3d 64, 70 (3d Cir. 1999), their election laws "inevitably affect[,] at least to some degree[,]" certain fundamental rights, including the right to vote[8] and First Amendment rights of free expression and association, *Anderson*, 460 U.S. at 788. So the question arises, what test should courts apply to evaluate the constitutionality of those laws?

In some cases, a traditional First Amendment test fails to account for the fact that, for elections to run smoothly, some restrictions on expression and association are necessary. Recognizing this, the Supreme Court in *Anderson* and *Burdick*

---

[8] The right to vote has long been recognized as a fundamental political right under the Constitution. *See, e.g.*, *Wesberry v. Sanders*, 376 U.S. 1, 6-7 (1964).

crafted a unique test for "[c]onstitutional challenges to specific provisions of a State's election laws." *Anderson*, 460 U.S. at 789. This test is "more flexible" than the rigid tiers of scrutiny under a traditional First Amendment analysis, *Burdick*, 504 U.S. at 434, reflecting the reality that there is no "'litmus-paper test' that will separate valid from invalid restrictions," *Anderson*, 460 U.S. at 789 (quoting *Storer*, 415 U.S. at 730).

The *Anderson-Burdick* test requires the reviewing court to (1) determine the "character and magnitude" of the burden that the challenged law imposes on constitutional rights, and (2) apply the level of scrutiny corresponding to that burden. *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). If the burden is "severe," the court must apply exacting scrutiny and decide if the law is "narrowly tailored and advance[s] a compelling state interest." *Timmons*, 520 U.S. at 358. But if the law imposes only "reasonable, nondiscriminatory restrictions," *Anderson*, 460 U.S. at 788, the court may use *Anderson-Burdick's* sliding scale approach under which a State need only show that its "legitimate interests . . . are sufficient to outweigh the limited burden," *Burdick*, 504 U.S. at 440.

Courts have applied *Anderson-Burdick* to a wide range of state election laws covering nearly every aspect of the electoral process. *See, e.g.*, *Belitskus v. Pizzingrilli*, 343 F.3d 632, 643-47 (3d Cir. 2003) (applying *Anderson-Burdick* in challenge to Pennsylvania ballot access law requiring candidates to pay filing fee to have their names placed on the general election ballot); *Ohio Democratic Party v. Husted*, 834 F.3d 620, 626-36 (6th Cir. 2016) (applying *Anderson-Burdick* to a challenge to Ohio law that changed the first day of early

absentee voting from 35 days before election day to the day after the close of voter registration).

In other cases, however, the Supreme Court has declined to apply *Anderson-Burdick*'s balancing test and has reverted instead to a traditional First Amendment analysis. *See, e.g.*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995) (rejecting application of *Anderson-Burdick* in challenge to ban on anonymous leafletting of political materials as it constituted the "regulation of pure speech"); *Meyer v. Grant*, 486 U.S. 414, 420 (1988) (declining to apply *Anderson-Burdick* to free expression challenge to ban on paying petitioner circulators for ballot initiatives). The problem we confront today is that the Supreme Court has never laid out a clear rule or set of criteria to distinguish between these two categories of election laws, nor has any Court of Appeals to our knowledge. So to decide the category in which New Jersey's consent requirement falls, we must first identify their defining characteristics.

### B.    When Does the *Anderson-Burdick* Test Apply?

A survey of the Supreme Court's case law both before and after *Anderson* and *Burdick* reveals two principal characteristics of the laws to which their test applies. First, the law must burden a relevant constitutional right, such as the right to vote or the First Amendment rights of free expression and association. Second, the law must primarily regulate the mechanics of the electoral process, as opposed to core political speech. We address each below.

1.    ***Anderson-Burdick* Applies Beyond
Free Association Claims.**

Appellants espouse a narrow view of the constitutional rights that trigger review under *Anderson-Burdick*, contending that the test is limited to challenges based on First Amendment free association claims.    But precedent from the Supreme Court and our sister circuits defies this cramped view and applies *Anderson-Burdick* to vindicate a variety of constitutional rights.

True, *Anderson* itself focused on "voters' freedom of association," 460 U.S. at 787-88, and associational rights have also played a central role in many of the Supreme Court's other cases applying the *Anderson-Burdick* test. *See, e.g.*, *Clingman v. Beaver*, 544 U.S. 581, 588 (2005) (focusing on the associational interests of voters); *Norman*, 502 U.S. at 288, 290 (focusing on "the constitutional interest of like-minded voters to gather in pursuit of common political ends" under the "First Amendment right of political association"); *Timmons*, 520 U.S. at 358 (discussing "associational rights"); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 444 (2008) (focusing on "political parties' associational rights").

But the Court has also applied *Anderson-Burdick* to free speech claims.    Indeed, *Burdick* itself concerned a claimed right to send a message by casting a "protest vote."  504 U.S. at 438.    Other examples abound. *See Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 222, 224 (1989) (applying the *Anderson* test where the challenged law "directly affect[ed] speech" in addition to "infring[ing] upon [voters'] freedom of association"); *Timmons*, 520 U.S. at 357, 363 (tying associational rights to "the independent expression of a political party's views" and recognizing that the challenged

17

law, in addition to burdening associational rights, "also limit[ed], slightly, the party's ability to send a message to the voters and to its preferred candidates") (quoting in part *Colo. Republican Fed. Campaign Comm'n v. Fed. Election Comm.*, 518 U.S. 604, 616 (1996)). As these cases make clear, *Anderson-Burdick* pertains not only to association claims, but also to challenges to election laws that "have the effect of channeling expressive activity at the polls." *Burdick*, 504 U.S. at 438.

Nor is *Anderson-Burdick* limited to First Amendment challenges. Certainly, it does not apply where the alleged right relates only to a statutory right or there is otherwise no cognizable constitutional right at issue[9] or where the burden on

---

[9] *Valenti v. Lawson* declined to apply *Anderson-Burdick* to a law that banned a registered sex offender from voting at a school because sex offenders were not a suspect class and convicted felons had no constitutional right to vote, "only . . . a statutory right to vote" to the extent permitted by a State. 889 F.3d 427, 429-30 (7th Cir. 2018); *see also Donatelli v. Mitchell*, 2 F.3d 508, 514, 515 n.10 (3d Cir. 1993) (no constitutional right implicated where state reapportionment plan resulted in the temporary reassignment of a state senator to a new district for the remainder of his term, statute was not targeted at a discrete group of voters, and did not deprive voters of equal access to ballot); *Biener v. Calio*, 361 F.3d 206, 215 (3d Cir. 2004) (noting that "[t]he right to run for office has not been deemed a fundamental right" and "voter's rights are not infringed where a candidate chooses not to run because he is unwilling to comply with reasonable state requirements") (quoting in part *Adams v. Askew*, 511 F.2d 700, 703 (5th Cir. 1975)); *Cecelia Packing Corp. v. U.S. Dept. of Agric./Agric.*

a constitutional right is no more than *de minimis*.[10]  But it has

_____

*Mktg. Serv.*, 10 F.3d 616, 624 (9th Cir. 1993) (declining to apply *Anderson-Burdick* to a law regulating voting in agricultural marketing order referenda because the right to vote did not extend to elections for government officials who "do not exercise general governmental powers"); *Hayden v. Paterson*, 594 F.3d 150, 169-70 (2d Cir. 2010) (applying rational basis review to a felon disenfranchisement law that was otherwise nondiscriminatory); *Kessler v. Grand Cent. Dist. Mgmt. Ass'n, Inc.*, 158 F.3d 92, 105, 108 (2d Cir. 1998) (declining to apply *Anderson-Burdick* balancing to a malapportionment challenge because, while the elected body performed types of services "often provided by local government," its role was secondary to city and therefore did not exercise "responsibilities or general powers typical of a governmental entity").

[10] *See Molinari v. Bloomberg*, 564 F.3d 587, 606 (2d Cir. 2009) (declining to apply *Anderson-Burdick* where the only effect on First Amendment rights was "incidental[] and constitutionally insignificant") (alteration in original) (quoting *Cohen v. Cowles Media Co*., 501 U.S. 663, 672 (1991)).  In *Clingman*, for example, the Supreme Court considered a semi-closed primary law, under which members of a given party and Independents could vote in that party's primary, but not members of other parties.  544 U.S. at 584.  The law was challenged by a group of Democratic and Republican voters who wished to vote in the Libertarian Party's primary without changing their party affiliation.  *See id.* at 588.  The Court was skeptical of the alleged burden on plaintiffs' association claims, however, and, observing they did "not want to associate with the [Libertarian Party], at least not in any formal

been applied to the right to vote,[11] the right to "travel throughout the United States,"[12] and the right to procedural due

---

sense," noted that "a voter who is unwilling to disaffiliate from another party to vote in [another party's] primary forms little 'association.'" *Id.* at 588-89; *see also Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 12 (1982) (applying rational basis review to a challenge to a State's choice to fill legislative vacancies by appointment because any effect on individual rights was "minimal").

[11] In *Crawford v. Marion County Election Board*, for instance, the Supreme Court recognized that "'evenhanded restrictions that protect the integrity and reliability of the electoral process itself' are not invidious," and proceeded to apply *Anderson-Burdick*'s balancing test to the voter identification law at issue. 553 U.S. 181, 189-91 (2008) (plurality opinion) (quoting *Anderson*, 460 U.S. at 788 n.9). The plurality opinion from which these quotations are taken commanded only the votes of three Justices. But while the three concurring Justices disagreed on how exactly to apply the *Anderson-Burdick* test, they all agreed that "generally applicable, nondiscriminatory voting regulation[s]" are subject to the balancing test. *See Crawford*, 553 U.S. at 205-06 (Scalia, J., concurring).

[12] In *Dunn v. Blumstein*, the Court observed that a State's durational residency requirements burdened not only the right to vote, but also the distinct right "to travel throughout the United States." 405 U.S. 330, 338 (1972) (quoting *United States v. Guest*, 383 U.S. 745, 758 (1966)); *see also Donatelli v. Mitchell*, 2 F.3d 508, 515 (3d Cir. 1993) (distinguishing State's reapportionment plan from *Dunn* on grounds that it did not burden right to travel).

process,[13] among others.

We have no occasion here to exhaust the list of constitutional claims reviewable under the *Anderson-Burdick* test. It suffices for present purposes that this test is not limited to laws that burden free association.

### 2. *Anderson-Burdick* Applies to Laws that Regulate the Mechanics of the Electoral Process

The fact that an election law burdens a fundamental right is necessary but not sufficient to trigger *Anderson-Burdick*; the law also must regulate "the mechanics of the electoral process." *McIntyre*, 514 U.S. at 345. After all, the basic premise of *Anderson-Burdick* is that ordinary election laws necessarily have incidental burdens on political speech by "channeling expressive activity at the polls[,]" meaning that courts must examine whether a law that burdens speech is nonetheless directed primarily at regulation of the electoral process. *Burdick*, 504 U.S. at 438. Thus, if the law primarily regulates the electoral process, we employ *Anderson-Burdick* and determine the appropriate level of scrutiny. Conversely, if the law does not primarily regulate the electoral process and

---

[13] *See Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1194-95 (9th Cir. 2021); *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 233-35 (5th Cir. 2020); *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020).

instead aims at regulating political speech, it is subject to a traditional First Amendment analysis.[14]

The Supreme Court's case law bears this out, applying *Anderson-Burdick* to a wide range of electoral-process regulations. These include the time, place, and manner of elections, such as "notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Smiley*, 285 U.S. at 366. In line with this broad authority, the Supreme Court has also applied *Anderson-Burdick* to ballot access rules, *see Anderson*, 460 U.S. at 788-806; *Norman*, 502 U.S. at 288-91; regulation of party primaries, *see Tashjian v. Republican Party*, 479 U.S 208, 214-29 (1986); *Grange*, 552 U.S. at 451-59; voter identification laws, *see Crawford*, 553 U.S. at 189-204; and the content of ballots, *see Burdick*, 504 U.S. at 428; *Timmons*, 520 U.S. at 351-52.

The Courts of Appeals have followed suit, scrutinizing under *Anderson-Burdick* laws regulating, *e.g.*, the order in

---

[14] The Supreme Court has also explained that the Elections and Electors Clauses themselves impose limits on a state's power to regulate federal elections. *See, e.g.*, *Cook v. Gralike*, 531 U.S. 510, 525-26 (2001) (holding that requiring ballot designation reflecting candidates' views on term limits fell "far from regulating the procedural mechanisms of elections" and instead attempted to dictate electoral outcomes). Because such laws fall outside of State's constitutional authority, they do not enjoy the deference afforded by the *Anderson-Burdick* balancing test.

which candidates' names appear on the ballot,[15] whether the ballot is electronic,[16] the form and content of ballot initiatives,[17] absentee voting,[18] early voting,[19] nomination of

---

[15] *Pavek v. Donald J. Trump for President, Inc.*, 967 F.3d 905, 907-08 (8th Cir. 2020).

[16] *See, e.g.*, *Wexler v. Anderson*, 452 F.3d 1226, 1232-33 (11th Cir. 2006); *Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003).

[17] *See, e.g.*, *Thompson v. DeWine*, 976 F.3d 610, 615-16 (6th Cir. 2020); *Lemons v. Bradbury*, 538 F.3d 1098, 1103-04 (9th Cir. 2008); *Kendall v. Balcerzak*, 650 F.3d 515, 525, 528 (4th Cir. 2011); *Schmitt v. LaRose*, 933 F.3d 628, 639-42 (6th Cir. 2019); *Campbell v. Buckley*, 203 F.3d 738, 741, 743-45 (10th Cir. 2000).

[18] *See, e.g.*, *Hobbs*, 18 F.4th at 1181; *Tully v. Okeson*, 977 F.3d 608, 615-16 (7th Cir. 2020); *Short v. Brown*, 893 F.3d 671, 676-79 (9th Cir. 2018); *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 107-12 (2d Cir. 2008).

[19] *See, e.g.*, *Husted*, 834 F.3d at 626-27.

candidates,[20] voter registration,[21] the counting of ballots,[22] polling hours,[23] voter identification and proof-of-citizenship

---

[20]*See, e.g., N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 205 (2008).

[21] *See, e.g., Fish v. Schwab*, 957 F.3d 1105, 1121-23 (10th Cir. 2020); *Harlan v. Scholz*, 866 F.3d 754, 759-61 (7th Cir. 2017); *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387-88 (5th Cir. 2013). Importantly, the law at issue in *Steen* regulated only the qualifications for voter registration volunteers, not any of the expressive elements of voter registration, such as one-on-one communication. *See Steen*, 732 F.3d at 389-90. This demonstrates that voter registration can have both "electoral mechanics" and "pure speech" components, and that courts must carefully examine which components are implicated by a particular regulation.

[22] *See George v. Hargett*, 879 F.3d 711, 724-25 (6th Cir. 2018); *Libertarian Party v. D.C. Bd. of Elections and Ethics*, 682 F.3d 72, 73-74 (D.C. Cir. 2012). For a comprehensive discussion of the range of courts' application of *Anderson-Burdick* in the ballot-counting context, see PRINCIPLES OF THE L. OF ELECTION ADMIN.: NON-PRECINCT VOTING AND RESOL. OF BALLOT-COUNTING DISP. § 201 (AM. L. INST., Tentative Draft No. 2, 2017).

[23] *See, e.g.*, *Common Cause Ind. v. Lawson*, 978 F.3d 1036, 1040-41 (7th Cir. 2020).

requirements,[24] regulation of voter data,[25] the appointment and qualifications of election workers,[26] the use of primaries or caucuses,[27] the use of straight-ticket voting,[28] the use of ranked choice voting,[29] the cancellation of an uncontested primary,[30] the use of district-level or at-large election systems,[31] and the

---

[24] *See, e.g.*, *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 605-07 (4th Cir. 2016); *Gonzalez v. Arizona*, 485 F.3d 1041, 1050-51 (9th Cir. 2007).

[25] *See, e.g.*, *Fusaro v. Howard*, 19 F.4th 357, 361, 363-64 (4th Cir. 2021).

[26] *See, e.g.*, *Werme v. Merrill*, 84 F.3d 479, 483-84 (1st Cir. 1996).

[27] *See, e.g.*, *Cool Moose Party v. Rhode Island*, 183 F.3d 80, 82-88 (1st Cir. 1999).

[28] *See Tx. All. for Retired Ams. v. Scott*, 28 F.4th 669, 670-74 (5th Cir. 2022); *Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 660-69 (6th Cir. 2016).

[29] *See Dudum v. Artnz*, 640 F.3d 1098, 1100-17 (9th Cir. 2011).

[30] *See Yang v. Kosinski*, 960 F.3d 119, 126-36 (2d Cir. 2020).

[31] *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019-28 (9th Cir. 2016). We note that several of our sister Circuits have in recent years employed the *Anderson-Burdick* framework to evaluate challenges to the appointment of Presidential electors. *See Baten v. McMaster*, 967 F.3d 345, 373-75 (4th Cir. 2020);

composition of Independent Redistricting Commissions.[32] Even beyond laws governing the voting process itself, the appellate courts regularly apply *Anderson-Burdick* to regulations affecting candidates, including the qualifications of elected and appointed officers,[33] the filling of vacancies and special elections,[34] term limits,[35] and even the expulsion of elected officials.[36] Though each of these regulations necessarily implicated speech and association to some degree, each was nonetheless primarily directed at regulating specific mechanics of the electoral process.

---

*Rodriguez v. Newsom*, 974 F.3d 998, 1011 (9th Cir. 2020); *Lyman v. Baker*, 954 F.3d 351, 376-78 (1st Cir. 2020).

[32] *Daunt v. Benson*, 999 F.3d 299, 303-22 (6th Cir. 2021).

[33] *See, e.g.*, *Lindsay v. Bowen*, 750 F.3d 1061, 1063-64 (9th Cir. 2014); *Grizzle v. Kemp*, 634 F.3d 1314, 1322-26 (11th Cir. 2011).

[34] *See, e.g.*, *Tedards v. Ducey*, 951 F.3d 1041, 1067-68 (9th Cir. 2020); *Ayers-Schaffner v. DiStefano*, 37 F.3d 726, 729-31 (1st Cir. 1994).

[35] *See, e.g.*, *Kowall v. Benson*, 18 F.4th 542, 546-49 (6th Cir. 2021), *cert. denied*, 2022 WL 4651422 (Oct. 3, 2022); *Citizens for Legis. Choice v. Miller*, 144 F.3d 916, 920-24 (6th Cir. 1998).

[36] *See Monserrate v. N.Y. State Senate*, 599 F.3d 148, 155-57 (2d Cir. 2010).

In contrast, the *Anderson-Burdick* test does not apply to laws that are primarily directed at regulating "pure speech." *McIntyre*, 514 U.S. at 345. The distinction between "pure speech" and the mechanics of the electoral process is not always easy to ascertain. There are, however, two distinguishing factors to consider: the location and timing (the "where and when") and the nature and character (the "how and what") of the regulated speech.

### a)    Location and Timing of the Regulated Speech

The first factor courts should consider is where and when the regulated speech occurs. At one end of the spectrum, speech that occurs on the ballot or within the voting process will typically trigger application of the *Anderson-Burdick* balancing test. *See, e.g.*, *Burdick*, 504 U.S. at 437-38 (applying *Anderson* where the speech being regulated was a voter's desire to cast a write-in vote on the ballot itself); *cf. Tashjian*, 479 U.S. at 217 ("It is, of course, fundamental . . . that this impingement upon the associational rights of the Party and its members occurs at the ballot box . . . ."). At the other end of the spectrum, speech that relates to an election but occurs nowhere near the ballot or any other electoral mechanism is treated as core political speech entitled to the fullest First Amendment protection. *See, e.g.*, *McIntyre*, 514 U.S. at 347 (applying strict scrutiny where the speech being regulated was leafletting that occurred far from the polling place and potentially weeks or months before Election Day).

In between these two extremes, close analysis is necessary to examine the challenged law with a functional approach in mind, rather than drawing any bright lines based on physical location. States have a legitimate interest, for

example, in regulating the polling place to ensure order and fairness, as with any other mechanic of the electoral process. *See Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1887 (2018) ("Casting a vote is a weighty civic act, akin to a jury's return of a verdict, or representative's vote on a piece of legislation. It is a time for choosing, not campaigning.  The State may reasonably decide that the interior of the polling place should reflect that distinction.")

<b>b)     Nature and Character of the<br/>Regulated Speech</b>

The second factor courts should consider in distinguishing between laws directed to the mechanics of the electoral process and those aimed at core political speech is the nature and the character of the regulated speech: what is being said and how it is communicated.  In *Buckley v. American Constitutional Law Foundation, Inc.*, the Supreme Court characterized the lodestar for "core political speech" as the involvement of "interactive communication concerning political change."  525 U.S. 182, 186 (1999) (quoting *Meyer*, 486 U.S. at 422).  Under this rationale, the Court has declined to apply *Anderson-Burdick* to election-related regulations that burdened such interactive communication between individuals.  *See Meyer*, 486 U.S. at 421-22 (concluding that law prohibiting payment for petition circulators was a regulation of core political speech because circulators must engage one-on-one with potential signatories about the pressing issues of the day); *McIntyre*, 514 U.S. at 345-46 & n.10 (concluding ban on anonymous political leafleting regulated pure political speech); *Buckley*, 525 U.S. at 199 (concluding that a requirement that petition circulators be registered voters implicated "core political speech" no less than the "fleeting encounter" of leafletting or the more

28

involved "discussion of the merits" that attended the petition circulation) (quoting in part *Meyer*, 486 U.S. at 421). This principle aligns with other precedents: both the campaign speech in *Burson* and the political attire in *Mansky* had the potential to spark direct interaction and conversation, while *Burdick*'s write-in vote did not.

With these two factors in mind, the line dividing core political speech from the mechanics of the electoral process comes into sharper focus. Extensive case law reaffirms the wide range of electoral mechanics that States must necessarily regulate to safeguard the honesty and fairness of elections, and we are wary of categorically removing any particular area of election regulation from *Anderson-Burdick*'s ambit. At the same time, however, we do not mechanically apply *Anderson-Burdick* balancing any time a state election law is challenged. Rather, we must engage in a careful analysis to determine if the challenged law primarily regulates the mechanics of the electoral process, or if it is in fact directed to the type of interactive, one-on-one communication that constitutes core political speech. With these considerations in mind, we turn to the challenged law at issue today.

### C.    Which Test Applies to New Jersey's Consent Requirement?

Having clarified the standards that determine when courts should apply the *Anderson-Burdick* balancing test to a challenged election law, we now apply that standard to New Jersey's consent requirement. For the reasons that follow, we conclude that *Anderson-Burdick* is indeed the appropriate framework**.**

### 1.      The Consent Requirement Burdens Expressive Rights

The first requirement, that the law burden a relevant constitutional right, is satisfied, as the consent requirement burdens Appellants' freedom of expression.

Under the consent requirement, candidates must obtain authorization from any individual or New Jersey-incorporated association before using their name in a ballot slogan. Appellants argue that, where a candidate has not obtained authorization, the consent requirement "forbid[s] an explicit message Plaintiffs want to send to voters," thereby burdening their freedom of speech.  Appellant Br. at 22.  As discussed above, the Supreme Court has been skeptical of efforts to assert an unqualified right to speech via the ballot, but it has nonetheless applied the *Anderson-Burdick* balancing test to laws that regulate ballot speech.  *See Burdick*, 544 U.S. at 438 (ban on write-in votes burdened speech by prohibiting "protest vote" on a ballot); *Timmons*, 520 U.S. at 363 (requirement that candidates only appear under one party on the ballot "also limit[ed], slightly, the party's ability to send a message to the voters and to its preferred candidates").[37]

---

[37] While Appellants focus on the consent requirement's impact on speech rights, the consent requirement also burdens associational rights by limiting a candidate's ability to associate with particular individuals or incorporated associations, and as a result with voters, via the ballot.  Indeed, the interests asserted by the Government—protecting election integrity and preventing voter deception and confusion— demonstrate that a primary function of the consent requirement is to prevent candidates from associating with other entities

In sum, the consent requirement burdens freedom of expression, such that the first threshold requirement of the *Anderson-Burdick* framework has been satisfied.

### 2.     The Consent Requirement Regulates a Mechanic of the Electoral Process

The other requirement—that the law primarily regulate a mechanic of the electoral process, rather than core political speech—is also satisfied.  The consent requirement regulates the words that may appear on the ballot, which is the archetypical mechanic of the electoral process for which the *Anderson-Burdick* test is designed.  For ballots to be effective tools for selecting candidates and conveying the will of voters, they must be short, clear, and free from confusing or fraudulent content.  This necessarily limits the degree to which the ballot may—or should—be used as a means of political communication.  *See Burdick*, 504 U.S. at 438 ("[T]he function of the election process is to 'winnow out and finally reject all but the chosen candidates[.]'") (quoting *Storer*, 415 U.S. at

without those entities' consent.    Appellant McCormick's proposed slogan "Not Me. Us." is a perfect example: Under the consent requirement, she is precluded from associating with the Bernie Sanders campaign or his supporters via his campaign's slogan without authorization.    The consent requirement thus imposes a similar burden on association as the ban on "fusion candidates" in *Timmons*.  *See* 520 U.S. at 360 ("Respondent is free to try to convince Representative Dawkins to be the New Party's, not the DFL's, candidate . . . . Whether the party still wants to endorse a candidate who, because of the fusion ban, will not appear on the ballot as the party's candidate, is up to the party.") (citation omitted).

735); *id.* ("Attributing to elections a more generalized expressive function would undermine the ability of States to operate elections fairly and efficiently."); *Timmons*, 520 U.S. at 365 (treating ballots as forums for political expression "would undermine the ballot's purpose by transforming it from a means of choosing candidates to a billboard for political advertising"); *Caruso v. Yamhill Cnty. Ex rel. Cnty Comm'r*, 422 F.3d 848, 851, 856 (9th Cir. 2005) ("[T]he fact that the ballot is 'crucial' to an election does not imply that [initiative proponent] therefore has a First Amendment right to communicate a specific message through it."); *Rosen v. Brown*, 970 F.2d 169, 175 (6th Cir. 1992) (ballots are "State-devised form[s]" that are "necessarily short" and thus not suitable "for narrative statements by candidates").

Appellants and Amicus protest that, even if the ballot is usually an electoral mechanic, it ceases to be one once a State opens the ballot up for candidates to communicate to voters. As the Government points out, however, courts regularly apply the *Anderson-Burdick* test to laws that regulate the content of ballots, including the information placed beside a candidate's name. *See Chamness v. Bowen*, 722 F.3d 1110, 1116-17 (9th Cir. 2013) (challenge to restrictions on "party preference" ballot designations); *Rubin v. City of Santa Monica*, 308 F.3d 1008, 1013-14 (9th Cir. 2002) (challenge to "ballot designation" law that allowed candidates to list their occupations beside their names but which prevented the plaintiff from designating himself a "peace activist"); *Caruso*, 422 F.3d at 851, 855-57 (challenge to requirement that ballot initiatives "proposing local option taxes include a statement" that the "measure may cause property taxes to increase").

But, say Appellants, the slogan statutes explicitly provide that ballot slogans exist "for the purpose of indicating either any official act or policy to which [a candidate] is pledged or committed, or to distinguish him as belonging to a particular faction or wing of his political party." N.J.S.A. § 19:23-17. That may be so, but it does not alter our analysis. Whether a State chooses to allow communication via the ballot for a specific purpose changes neither the fact that the State nonetheless has a duty to regulate the content of ballots, nor the fact that the State's policy choices in this area are due deference under the *Anderson-Burdick* framework.

As a fallback, Appellants attempt to characterize New Jersey's consent requirement as a regulation of core political speech, but New Jersey's ballot slogans differ in two important respects from core political speech. First, unlike the core political speech at issue in *Meyer* or *McIntyre*, which occurred outside of the polling place and over a long period of time leading up to Election Day, the speech that occurs within a ballot slogan is confined to the ballot itself at the moment a vote is cast. Second, ballot slogans are different in kind from core political speech. The Supreme Court has emphasized the "interactive" nature of "core political speech." *See Meyer*, 486 U.S. at 421-22. That crucial element, however, is missing here. Ballot slogans, unlike leafletting, petition circulating, or even the wearing of political clothing at the polling place, cannot inspire any sort of meaningful conversation regarding political change. Rather, the ballot slogan, like the protest vote at issue in *Burdick*, is a one-way communication confined to the electoral mechanic of the ballot. *See Burdick*, 504 U.S. at 438.

In sum, New Jersey's consent requirement regulates only the ballot itself—a classic electoral mechanic—and does

not regulate core political speech. Thus, *Anderson-Burdick* is the appropriate constitutional standard to be applied.

### D.    The Consent Requirement Is Constitutional Under the Relevant Test

Having established that the *Anderson-Burdick* test is the correct constitutional standard, we now apply that standard to New Jersey's consent requirement. The *Anderson-Burdick* framework employs a "two-track approach." *Crawford*, 553 U.S. at 205 (Scalia, J., concurring). "[O]ur scrutiny is a weighing process: We consider what burden is placed on the rights which plaintiffs seek to assert and then we balance that burden against the precise interests identified by the state and the extent to which these interests require that plaintiff's rights be burdened." *Rogers v. Corbett*, 468 F.3d 188, 194 (3d Cir. 2006); *see also Burdick*, 504 U.S. at 434 ("Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens [constitutional] rights."). If the law imposes a "severe" burden, then "[s]trict scrutiny is appropriate." *Crawford*, 553 U.S. at 205 (Scalia, J., concurring) (quoting *Clingman*, 544 U.S. at 592). But if a burden is not severe and "imposes only 'reasonable, nondiscriminatory restrictions'" on constitutional rights, "the State's important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788).

For the reasons that follow, we conclude that New Jersey's consent requirement is constitutional, as it does not impose a severe burden on Appellants' First Amendment rights, and New Jersey's interests in protecting the integrity of elections and preventing voter deception and confusion are

sufficient to justify the consent requirement's minimal burdens.

### 1. The Consent Requirement Does Not Impose Severe Burdens on First Amendment Rights

As discussed above, New Jersey's consent requirement burdens the expressive rights of candidates. The question, however, is the severity of that burden. There is no "litmus test for measuring the severity of a burden that a state [election] law imposes." *Crawford*, 553 U.S. at 191. Here, though, we conclude that the consent requirement imposes only a minimal burden because (a) the requirement is nondiscriminatory and applies equally to all candidates and slogans; (b) the requirement leaves open ample and adequate alternatives for expression and association; and (c) Appellants have failed to provide evidence of any specific burden on either themselves or any other candidate.

### a) The Consent Requirement is Non-Discriminatory

Election laws that discriminate by "limit[ing] political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status" impose severe burdens and will be "especially difficult for the State to justify." *Anderson*, 460 U.S. at 793. That discrimination can come in different forms.[38] None, however, is implicated by the consent requirement.

---

[38] Laws that burden the right to vote based on classifications unrelated to voter qualifications, and therefore

###### i.    Discrimination Among Candidates, Parties, or Voters.

In the case of discrimination among candidates, parties, or voters, the Court's "ballot access cases . . . focus on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process. The inquiry is whether the challenged restriction unfairly or unnecessarily burdens 'the availability of political opportunity.'" *Anderson*, 460 U.S. at 793 (quoting *Clements v. Fashing*, 457 U.S. 957, 964 (1982) (plurality opinion)); *cf. Williams v. Rhodes*, 393 U.S. 23, 24, 32 (1968) (applying strict scrutiny where state laws in effect gave the two major parties "a complete monopoly" by making it "virtually impossible for a new political party . . . to be placed on the state ballot"). In *Anderson*, for example, Ohio required Independent candidates seeking a place on the ballot to file in March, long before major-party candidates, thus "totally exclud[ing] any candidate who [made] the decision to run for President as an independent after the March deadline." *Id.* at 792. The law also burdened the associational rights of two distinct groups of voters: Independent voters who wished to nominate Independent candidates, due to the added difficulty of

---

disproportionately affect certain classes of voters, impose a severe burden and therefore would trigger strict scrutiny under *Anderson-Burdick*. *See, e.g.*, *Hussey v. City of Portland*, 64 F.3d 1260, 1265-66 (9th Cir. 1995) (applying strict scrutiny under *Anderson-Burdick* to a law denying a utility subsidy to voters who voted against annexation because it "disproportionately affect[ed] the poor" and "severely" interfered with the right to vote).

campaigning further out from Election Day, and "disaffected" voters who decided to support an Independent candidate only after seeing the nominees put forward by the two major parties. *See id.* at 790-91. The early filing deadline therefore "discriminate[d] against those candidates and—of particular importance—against those voters whose political preferences lie outside the existing political parties." *Id.* at 794.

In contrast, burdens that apply to all voters, parties, or candidates are less likely to be severe. In *Storer*, California prohibited Independent candidates from appearing on the ballot as such if they had been a member of a political party or voted in a party's primary in the past year, but it also "impose[d] a flat disqualification upon any candidate seeking to run in a party primary" who had been a member of a different party within the past year. *See* 415 U.S. at 733-34. The law therefore "involve[d] no discrimination against independents." *Id.* at 733. Likewise, in *Timmons*, Minnesota's ban on "fusion candidates," who are candidates designated as the candidate for more than one party, was not discriminatory because it "applie[d] to major and minor parties alike." 520 U.S. at 360. Even laws that give modest preferential treatment to major political parties at the expense of minor parties may be constitutionally firm. *See, e.g.*, *Jenness v. Fortson*, 403 U.S. 431, 432 (1971) (upholding higher petition requirement for non-major parties); *Norman*, 502 U.S. at 279 (same, for greater signature requirement); *Daunt v. Benson*, 956 F.3d 396, 402 (6th Cir. 2020) (concluding no severe burden where Michigan law required certain composition of members on redistricting commission based on party affiliation).

Here, New Jersey's consent requirement applies to all primary candidates and to any slogans mentioning a person or

a New Jersey incorporated association.  The law thus draws no distinctions and does not impose unique burdens on any identifiable group of voters or candidates.

### ii.    Discrimination Based on Content or Viewpoint.

Whether a law is viewpoint- or content-based may also bear on the severity of the burden imposed.[39]  New Jersey's consent requirement, however, is neither content- nor viewpoint-based.

The government may not restrict speech because of its "message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002)).  A regulation of speech is "facially content based" if it target[s] speech 'based on its communicative content.'"  *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (quoting

---

[39] A content-based law does not necessarily impose a severe burden, however, if it does not prohibit or limit speech on any particular topic or otherwise favor certain candidates or outcomes. *See, e.g.*, *Caruso*, 422 F.3d at 857-58 (upholding an Oregon law requiring ballot initiatives proposing local taxes to include a statement that the measure "may cause property taxes to increase more than three percent" because—in contrast to a Missouri law that was "not neutral" and that "skew[ed] the ballot listings," *Cook v. Gralike*, 531 U.S. 510, 532 (2001) (Rehnquist, C.J. concurring)—the tax-statement requirement "applie[d] to all 'measures authorizing the imposition of local option taxes,' . . . so no measure or group of measures was 'singled out'") (cleaned up).

*Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)) (alteration in original).  In other words, a regulation is content based if the regulation applies to speech "because of the topic discussed or the idea or message expressed." *Id.* (quoting *Reed*, 576 U.S. at 163).  Content-based election regulations may be severe when they "[l]imit[] speech based on its 'topic' or 'subject'"; such laws "present, albeit sometimes in a subtler form, the same dangers as laws that regulate speech based on viewpoint" because they "favor[] those who do not want to disturb the status quo" and may "interfere with democratic self-government and the search for truth."  *Reed*, 576 U.S. at 174 (Alito, J., concurring).

Content neutral laws, on the other hand, do not regulate speech based on its content, but rather do so based on some other neutral characteristic of the speech.  Most content neutral laws fall into the category of "Time, Place, or Manner" regulations, which dictate only when, where, or how speech must be conveyed, regardless of the message.  *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  "[T]he essence of time, place, or manner regulation lies in the recognition that various methods of speech, regardless of their content, may frustrate legitimate governmental goals.  No matter what its message, a roving sound truck that blares at 2 a. m. disturbs neighborhood tranquility."  *Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 536 (1980).

Appellants contend that the consent requirement is content based because whether it applies to a given ballot slogan will depend on whether the slogan names an individual or a New Jersey incorporated association.  Appellants rest their argument almost entirely on the Supreme Court's decision in

*Reed*, where a town's sign ordinance treated certain categories of signs, like "Ideological," "Political," and "Temporary Directional Signs," differently. 576 U.S. at 159-60. Observing that a law is content-neutral if it "target[s] speech based on its communicative content," the Supreme Court held that the sign code was "content based on its face" because each of these categories was defined by the subject matter conveyed by the signs. *Id.* at 164. Appellants seize on the phrase "target[s] speech based on its communicative content" in *Reed*. The upshot, according to Appellants, is that "the law applies only when certain words are present in a statement," Appellant Br. at 10, or when an official would need to "examine the content of the message that is conveyed to determine whether a violation has occurred," Appellant Br. at 11 (quoting *McCullen v. Coakley*, 573 U.S. 464, 479 (2014)).

The Supreme Court expressly rejected that argument in *City of Austin v. Reagan National Advertising of Austin, LLC*, 142 S. Ct. 1464 (2022). At issue was Austin, Texas's sign code, which allowed digital signs for businesses operating on the premises of a building but generally prohibited signs for off-premises activities. *Id.* at 1472. The Fifth Circuit had held that the on-/off-premises distinction was facially content based because its application depended on the sign's message, but the Supreme Court disagreed, explaining that the message only mattered insofar as it informed the sign's location, making the law analogous to a content neutral "time, place, or manner restriction[]." *Id.* at 1470, 1473.

By way of illustration, the Court pointed to *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981). There, the Minnesota State Fair prohibited the sale or distribution of any merchandise by "all

persons, groups or firms which desire to sell, exhibit or distribute materials," except from a booth rented by the fair. *Id*. at 643-44. The Court upheld the anti-solicitation law as a content neutral "time, place, or manner" regulation because it "applie[d] evenhandedly to all who wish[ed] to distribute and sell written materials or to solicit funds," *id*. at 648-49, regardless of whether "one must read or hear [the speech]" to "identify whether speech entails solicitation," *City of Austin*, 142 S. Ct. at 1473 (discussing *Heffron*). The Court thus distinguished *Reed* as "swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result" and reaffirmed that classifications that consider function or purpose are not always content based. *Id*. at 1474.

Under *City of Austin*, then, a law is "agnostic as to content," if it "requires an examination of speech only in service of drawing neutral" lines. *Id*. at 1471. One category of such neutral line-drawing tracks ordinary time, place, or manner regulations, such as the on-/off-premises distinction at issue in *City of Austin*, which related only to the location of speech. *See id*. at 1472-73. A second category of neutral line-drawing distinguishes between speech based on its function or purpose without indirectly regulating subject matter, such as whether speech constitutes "solicitation." *Id*. at 1473.

New Jersey's consent requirement falls into a third category of permissible neutral line-drawing that distinguishes between speech based on extrinsic features unrelated to the message conveyed. Unlike the sign code in *Reed*, the consent requirement applies to all slogans, regardless of message, and does not "single out any topic or subject matter for differential treatment." *Id*. at 1472. Appellants argue that the consent requirement regulates slogans based "entirely on the

communicative content of [slogans,]" but this is not so. Reply Br. at 4 (quoting *Reed*, 576 U.S. at 164). Rather, the communicative content of the slogan—*i.e.*, whether the slogan names an individual or a New Jersey incorporated association—only matters to determine whether the consent requirement applies at all. Once a regulator has read a slogan to determine whether the consent requirement applies, the communicative content of the slogan ceases to be relevant. Accordingly, the consent requirement is content neutral.

The consent requirement is also viewpoint neutral. Laws that directly regulate speech based on political viewpoint constitute a severe burden. "Viewpoint discrimination is an 'egregious form of content discrimination'" that targets speech based not on its subject but rather on "particular views taken by speakers." *Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 432 (3d Cir. 2019) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). Because regulation of particular views is especially offensive to the First Amendment, viewpoint discrimination is generally not permitted under any circumstances. *See Mansky*, 138 S. Ct. at 1885. Laws that restrict speech "regardless of the viewpoint that is expressed," in contrast, are viewpoint neutral. *Porter v. City of Philadelphia*, 975 F.3d 374, 391 (3d Cir. 2020).

The consent requirement applies equally to any viewpoint related to the person or entity named and the consent procedure is the same regardless of whether the candidate wishes to convey support or criticism of the named individual or association. Nonetheless, Appellants urge that the requirement *indirectly* discriminates against slogans that criticize individuals and New Jersey incorporated associations

because these entities are unlikely to give consent to be named in slogans that criticize them. This argument fails for two reasons. First, the Supreme Court has held that laws that ban "criticism" without regard to any particular viewpoint are content based, not viewpoint based. *See Boos v. Barry*, 485 U.S. 312, 319 (1988) (noting that, because a law prohibiting criticism of foreign governments outside embassies "determine[d] which viewpoint is acceptable in a neutral fashion," the law was content based, rather than viewpoint based). Second, the consent requirement does not directly regulate criticism, and "a facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics." *McCullen*, 573 U.S. at 480.

Appellants also argue that the consent requirement "deter[s] candidates from using their desired slogans, causing them to alter their messages," again citing the potential chilling effect on political speech. Appellant Br. at 32. One category of chilling effects involves laws that attach punitive consequences to particular exercises of protected speech after the fact. *See Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 672-73 (1996) (termination of an independent contractor for criticizing a local government); *Circle Schs. v. Pappert*, 381 F.3d 172, 180, 183 (3d Cir. 2004) (requiring school officials to notify parents of students who declined to recite the Pledge of Allegiance). This category is not implicated here, as New Jersey's consent requirement does not impose any consequences on a candidate's speech, but rather sets forth a condition that must be satisfied prior to a slogan being allowed on the ballot.

The Supreme Court has nonetheless acknowledged that an election law setting forth such an ex ante condition may

nonetheless have a chilling effect on speech, and therefore impose a severe burden, where the condition relates in some way to the viewpoint of the speech or association. *See Tashjian*, 479 U.S. at 218-25 (holding that requiring independent voters to affiliate publicly with a political party as a condition of voting in that party's primary imposed a severe burden). The District Court, citing to *Matal v. Tam*, 137 S. Ct. 1744 (2017), acknowledged that the consent requirement could "channel dissenting, negative, controversial, or unpopular slogans into more tolerable forms or benign/positive tones" because either individuals or New Jersey incorporated associations would not consent to being criticized on the ballot or because candidates would alter their own speech in order to obtain consent. *Mazo*, 551 F. Supp. 3d at 504. In *Matal*, the Supreme Court struck down a facially even-handed law prohibiting offensive trademarks with reference to whether the targeted speech was "offensive to a substantial percentage of the members of any group." 137 S. Ct. at 1763. The Court observed that "[g]iving offense is a viewpoint" and concluded that the restriction was viewpoint discriminatory. *Id.*

The consent requirement, in contrast, does no such thing: a candidate who wishes to criticize a public figure widely despised in New Jersey would be required to get the same consent as a candidate who wishes to criticize Bruce Springsteen. The consent requirement thus does not target any specific viewpoint, nor does it compel candidates to speak or associate in any particular way as a condition of using a given slogan. It is, instead, non-discriminatory. Thus, the potential, or even likely, effect of the consent requirement on critical speech is immaterial to both the viewpoint and content based inquiries.

**b)      The Consent Requirement
Leaves Open Alternatives for
Speech and Association**

A law that operates to explicitly or effectively exclude a group of candidates, voters, or parties from the ballot imposes a severe burden. *See, e.g.*, *Anderson*, 460 U.S. at 792-93 (concluding that early filing deadline imposed a severe burden by "totally exclud[ing]" Independent candidates who wanted to file after the March deadline); *Norman*, 502 U.S. at 289 (barring "candidates running in one political subdivision from ever using the name of a political party established only in another. . . . would obviously foreclose the development of any political party lacking the resources to run a statewide campaign"); *cf. Williams*, 393 U.S. at 32 (election laws were unconstitutional where they made it "virtually impossible for a new political party . . . to be placed on the state ballot"); *Libertarian Party of Conn. v. Lamont*, 977 F.3d 173, 177 (2d Cir. 2020) ("[The] hallmark of a severe burden is exclusion or virtual exclusion from the ballot.") (quoting *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016)).

One way that a State can lessen the burden imposed by an election law, then, is to provide alternative methods for the exercise of burdened rights. In *Timmons*, for instance, the Court agreed that Minnesota's "fusion candidate" ban "shut[] off one possible avenue a party might use to send a message," but nonetheless found the burden to be not severe because parties "retain[ed] great latitude in [their] ability to communicate ideas to voters and candidates through [their] participation in the campaign," and because voters could still "campaign for, endorse, and vote for their preferred candidate even if he [was] listed on the ballot as another party's

candidate." 520 U.S. at 362-63; *see also Rubin*, 308 F.3d at 1015-16 (concluding that law limiting how a peace activist candidate "may describe his occupation on the ballot" did not impose a severe burden because candidate retained ample alternative channels "for communicating his peace activities to the public").

Here, New Jersey's consent requirement leaves open the same two adequate alternatives as the "fusion candidate" ban in *Timmons*: first, candidates are free to try and earn the consent of individuals and incorporated associations with whom they would like to associate on the ballot; and second, Appellants remain free to say whatever they want and communicate any message about any individual or incorporated association so long as they do not do so via the ballot slogan. Appellants push back on this point, arguing that this reasoning would allow "New Jersey to violate a candidate's First Amendment rights once per primary season." Appellant Br. at 33. But their disagreement is misplaced. We do not examine each burden on speech in isolation. To the contrary, whether a particular restriction on speech violates the First Amendment depends in part on whether alternative channels exist. *Cf. Ward*, 491 U.S. at 791 (narrowly-tailored, content-neutral restrictions on speech are constitutional if they "leave open ample alternative channels for communication of the information") (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). So where, as here, Appellants have every other possible avenue to criticize or align themselves with individuals and groups, keeping that speech off the ballot simply does not impose a severe burden.

### c)    Appellants Provide No Evidence of Any Specific Burden to Either them or any other Candidate

Appellants bring a facial challenge to the consent requirement, which requires them to show that the consent requirement lacks "a plainly legitimate sweep," *Grange*, 552 U.S. at 449, or that a "substantial number" of its applications are unconstitutional, "judged in relation to [its] plainly legitimate sweep," *Ferber*, 458 U.S. at 770-71.  But it is easy to imagine legitimate applications of the consent requirement, such as where a candidate may try to use a ballot slogan to mislead or confuse voters into thinking they have been endorsed by a popular candidate or organization.  Here, the consent requirement serves to protect the associational rights of others.  As the Supreme Court observed in *Grange*, "a facial challenge fails where 'at least some' constitutional applications exist."  552 U.S. at 457 (quoting *Schall v. Martin*, 467, U.S. 253, 264 (1984)).

Evidence is key to the balancing of interests at the heart of the *Anderson-Burdick* framework.  *Cf. Grange*, 552 U.S. at 449 (emphasizing that facial challenges "raise the risk of 'premature interpretation of statutes on the basis of factually barebones records'") (quoting *Sabri v. United States*, 541 U.S. 600, 609 (2004)).  A court assessing whether a plaintiff has met his or her burden in a facial challenge "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases."  *Id.* at 450.  Thus, to determine whether the consent requirement's constitutional applications are outweighed by impermissibly burdensome applications, we need evidence of both the existence and

prevalence of such unconstitutional applications.  Appellants, however, provide none—their Complaint does not allege how many candidates want to use the names of individuals or New Jersey incorporated associations in their slogans, how many of those candidates sought consent, how many were denied consent, or the nature of the slogans that were ultimately rejected.  *See id.* ("[A]n empirically debatable assumption . . . is too thin a reed to support a credible First Amendment distinction' between permissible and impermissible burdens . . . .") (alteration in original) (quoting *Cal. Democratic Party v. Jones*, 530 U.S. 567, 600 (2000) (Stevens, J., dissenting)).

Appellants' Complaint does not suggest that Appellants themselves faced any burdens in seeking consent.  The most we can infer from Appellants' Complaint is that a candidate who wishes to use the name of an individual or group in their slogan must take some steps to seek consent, and that in some cases said consent is not given.  Such a burden is not trivial, but it is the sort of "ordinary and widespread" burden that the Supreme Court has long held to not be severe.  *Clingman*, 544 U.S. at 593; *Crawford*, 553 U.S. at 206 ("*Clingman*'s holding that burdens are not severe if they are ordinary and widespread would be rendered meaningless if a single plaintiff could claim a severe burden.") (Scalia, J., concurring); *cf. Norman*, 502 U.S. at 290 (concluding that total prohibition on using name of established party warranted strict scrutiny but acknowledging that State have could avoided constitutional infirmity "merely by requiring the candidates to get formal permission to use the name from the established party they seek to represent").

The District Court also suggested that candidates who are not able to use their preferred slogans might lose out on

"'the potential power of [naming a person or group] as a signal to voters of a candidate's ideological bona fides,' a valuable voting cue without which a candidate may face 'a potentially serious handicap.'" *Mazo*, 551 F. Supp. 3d at 504 (quoting *Soltysik v. Padilla*, 910 F.3d 438, 442 (9th Cir. 2018)).  That may be so, but for a burden to be severe, it is not enough that it makes it more difficult for a candidate or party to win an election.  Indeed, as the Court observed in *Timmons,* "[m]any features of our political system—*e.g.*, single-member districts, 'first past the post' elections, and the high costs of campaigning—make it difficult for third parties to succeed in American politics," but nonetheless, "the Constitution does not require States to permit fusion [candidacies] any more than it requires them to move to proportional-representation elections or public financing of campaigns." 520 U.S. at 362.  The same is true here.

In sum, New Jersey's consent requirement does not discriminate against any particular voters, candidates, parties, or viewpoints, and to the extent it limits candidates' ability to communicate or associate with voters via their preferred ballot slogans, that burden is mitigated by the availability of alternative avenues.  New Jersey's consent requirement thus imposes only a minimal burden on Appellants' First Amendment rights, so application of strict scrutiny under *Anderson-Burdick* is unwarranted.

### 2.    New Jersey's Interests are Sufficient to Justify the Consent Requirement's Minimal Burden

Where a state election law imposes only minimal burdens, the State's "'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory

restrictions.'" *Timmons*, 520 U.S. at 358 (quoting *Burdick*, 504 U.S. at 434). New Jersey asserts four interests that are furthered by the consent requirement: "preserving the integrity of the nomination process, preventing voter deception, preventing voter confusion, and protecting the associational rights of third parties who might be named in a slogan." *Mazo*, 551 F. Supp. 3d at 506.[40] Because the consent requirement does not impose a severe burden, a state must show "relevant and legitimate" interests that are "sufficiently weighty to justify the limitation" for the consent requirement to survive lesser scrutiny. *Crawford*, 553 U.S. at 191 (quoting in part *Norman*, 502 U.S. at 288-89). In considering the weight of these interests, our review is "quite deferential," *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 109 (2d Cir. 2008), and we will not require "elaborate, empirical verification of the weightiness of the State's asserted justifications," *Timmons*, 520 U.S. at 364.[41]

---

[40] The District Court also held that "[p]rotecting the associational rights of third parties who may be named in slogans" as a separate interest that was "closely correlated" with the other interests asserted by the Government. *Mazo*, 551 F. Supp. 3d at 507. We agree that protecting third parties' associational rights is a legitimate and important state interest for purposes of *Anderson-Burdick* balancing.

[41] Because the consent requirement does not impose a severe burden, there is no requirement that the law be narrowly tailored to the Government's asserted interests. *See, e.g.*, *Timmons*, 520 U.S. at 365. Furthermore, as stated previously, the Supreme Court expressly acknowledged in *Norman* that a State could "avoid" the ills of foreclosing one political party from using the name of an established party "merely by

Appellants concede that these are important and legitimate interests and the caselaw agrees. *See, e.g.*, *Eu*, 489 U.S. at 231 ("A State indisputably has a compelling interest in preserving the integrity of its election process."); *Rosario v. Rockefeller*, 410 U.S. 752, 761 (1973) ("It is clear that preservation of the integrity of the electoral process is a legitimate and valid state goal."); *Jenness*, 403 U.S. at 442 ("There is surely an important state interest . . . in avoiding confusion, deception, and even frustration of the democratic process[.]"); *Norman*, 502 U.S. at 290 (States have a legitimate interest in preventing "misrepresentation and electoral confusion"); *Tashjian*, 479 U.S. at 221-22 (States have "legitimate interests in preventing voter confusion and providing for educated and responsible voter decisions"); *Anderson*, 460 U.S. at 796 ("There can be no question about

---

requiring the candidates to get formal permission to use the name from the established party they seek to represent." 502 U.S. at 290. Because New Jersey's policy choices satisfy *Anderson-Burdick*, our inquiry ends there.

Appellants' proffered alternatives also fail on the merits. First, Appellants contend that "New Jersey could place a disclaimer on the ballot to alert voters that each slogan is an unverified statement of fact or opinion" and proceed to allow any and all slogans. Appellant Br. 17. But, as the Government points out, this could actually undermine voter confidence and would thus be less capable of achieving the State's legitimate end. Gov. Br. 37-38. Second, Appellants contend that New Jersey should make a carve-out for slogans that express criticism. Appellant Br. 17. But that accommodation would itself be a form of content and viewpoint based discrimination, and so would not be an appropriate alternative. Gov. Br. 38-39.

the legitimacy of the State's interest in fostering informed and educated expressions of the popular will.").

Because these interests are all important, they need only outweigh the minimal burden imposed by the consent requirement. *Burdick*, 504 U.S. at 439. We conclude that the balance weighs decisively in the Government's favor, and thus hold that the consent requirement is constitutional.

## V.    Conclusion

To safeguard the promise of democratic self-governance, our constitution charges States with the noble but often difficult duty to protect the fairness and integrity of elections without stifling the free exchange of ideas and associations that takes place between voters, parties, and candidates as part of every political campaign. And while courts have their own duty to fiercely guard First Amendment rights, where States enact politically neutral regulations of the mechanics of the electoral process itself, the deference embodied in the *Anderson-Burdick* balancing test is both appropriate and necessary. Here, New Jersey has struck a proper balance between the rights of voters, candidates, and third parties on the one hand, and the need to ensure order and fairness on the ballot on the other. We will therefore affirm the judgment of the District Court.